# UNITED STATES DISTRICT  COURT FOR THE EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION

GREAT LAKES TOWERS, LLC  d/b/a
VENTOWERINDUS1RIES,

            Plaintiff/ Counter-
            Defendant,

v.

CAMERON WIRE & CABLE, INC.

            Defendant/ Counter-
            Claimant

CAMERON WIRE & CABLE, INC.

            Third-Party Plaintiff

v.

GREGORY ADANIN

            Third-Party Defendant

Case No.: 2:20-cv-11014

Honorable Terrence G. Berg

## DEFENDANTS GREAT LAKES TOWERS LLC D/B/A VENTOWER INDUSTRIES AND GREGORY ADANIN'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff/Counter-Defendant  Great  Lakes  Towers,  LLC  d/b/a  Ventower

Industries ("Ventower") and Third-Party Defendant Gregory Adanin ("Mr. Adanin"

and together "Ventower Parties"), by and through their undersigned counsel, move

for summary judgment of Counts II, III and IV of Cameron Wire and Cable, Inc.'s

Counterclaim and Third-Party Complaint. The Ventower Parties also move for summary judgment of Cameron Wire's request for exemplary damages.

In support thereof, the Ventower Parties rely upon the accompanying Brief in Support.

Date: December 20, 2021

Respectfully submitted,

Hickey Hauck Bishoff Jeffers & Seabolt, PLLC

By:/s/ Scott T. Seabolt_____
Scott T. Seabolt (P55890)
Brooke Booth (P67731)
706 South Main Street
Plymouth, Michigan 48170
(313) 964-8600
sseabolt@hhbjs.com

ii

## UNITED STATES DISTRICT  COURT FOR
## THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GREAT LAKES TOWERS,LLC  d/b/a
VENTOWERINDUS1RIES,

               Plaintiff/ Counter-
               Defendant,

v.

CAMERON WIRE & CABLE, INC.

               Defendant/ Counter-
               Claimant

CAMERON WIRE & CABLE, INC.

               Third-Party Plaintiff

v.

GREGORY ADANIN

               Third-Party Defendant

Case No.: 2:20-cv-11014

Honorable Terrence G. Berg

## DEFENDANT GREAT LAKES TOWERS LLC D/B/A VENTOWER INDUSTRIES AND GREGORY ADANIN'S BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

## **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ................................................................. iii

ISSUES PRESENTED ..................................................................... viii

STATEMENT OF MATERIAL FACTS .............................................. 1

STANDARD OF REVIEW ................................................................11

ARGUMENT ..................................................................................11

    A. Count II – Breach of Contract – Fails As A Matter Of Law ..................11

    B. Counts   III   &   IV   For   Fraud   Fail   As   A   Matter   Of
    Law……………………………………….……………………… 12

        i.     There Is No Evidence That The Debit Memo Was False .............13

        ii.    Cameron   Wire   Could   Not   Have   Justifiably   Relied   On   A   Debit
            Memo   That   It   Believed   To   Be   False   When
            Received…………………………………………………………15

        iii.   Fraud Cannot Be Based On A Future Promise  ..........................16

        iv.   There Is No Evidence That Cameron Wire Justifiably Relied On A
            Future Promise…………………………………………………...18

    C. Exemplary Damages Fail As A Matter Of Law………….……………..21

CONCLUSION ...............................................................................23

iv

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Anderson v Liberty Lobby, Inc.*,
    477 U.S. 242, 248 (1986) ...........................................................11

*Beatty v. Haggard,*,
    87 Ark. App. 75, 84, 184 S.W.3d 479, 485 (2004) .........................15, 18, 21

*Belle Isle Grill Corp v. Detroit*,
    256  Mich App 463, 476; 666 NW2d 271 (2003) ......................................12

*Bennett v MIS Corp.*,
    607 F.3d 1076, 1100-1101 (6th Cir. 2010) ..................................................13

*Born v. Hosto & Buchan, PLLC*,
    372 S.W.3d 324, 333 (Ark. 2010) ............................................................13

*Callihan v. Talkowski*,
    372 Mich. 1, 6, 124 N.W.2d 788 (1963)....................................................20

*Casey v. Auto Owners Ins. Co.*,
    273 Mich.App. 388, 729 N.W.2d 277, 286 (Mich.Ct.App.2006)................23

*Celotex Corp. v Catrett*,
    477 U.S. 317, 322 (1986)..................................................................11, 12

*Clements Auto Co. v. Serv. Bureau Corp.*,
    444 F.2d 169, 185 (8th Cir. 1971)............................................................20

*Gage Prod. Co. v. Henkel Corp*.,
    393 F.3d 629, 646 (6th Cir. 2004) ………………………………….……..20

*Hi-Way Motor Co. v. Int'l Harvester Co.*,
    398 Mich. 330, 336, 247 N.W.2d 813, 816 (1976)………………15,17, 18, 21

*Hamade v Sunoco, Inc*,
    271 Mich. App. at 171, 721 N.W.2d 233 .............................................16, 18

*Hobson v. Entergy Arkansas, Inc.*,

2014 Ark. App. 101, 10, 432 S.W.3d 117, 124 (2014) .................................17

*Kelley v. Mid Continent Leasing Co.,*
    269 Ark. 912, 916, 601 S.W.2d 257, 259 (Ct. App. 1980). ...................16, 18

*Kewin v. Massachusetts Mut. Life Ins. Co.,*
    409 Mich. 401, 419–21, 295 N.W.2d 50, 55 (1980). ..................................22

*McClellan v. Brown,,*
    276 Ark. 28, 30, 632 S.W.2d 406, 407 (1982) ...........................................22

*McPeak v. McPeak,,*
    233 Mich.App. 483, 593 N.W.2d 180, 183 (Mich.Ct.App.1999). ..............22

*Moses v. Bus. Crd Express, Inc.*,
    929 F.2d 1131, 1140 (6th Cir. 1991) .........................................................12

*Nieves v. Bell Industries, Inc.,*
    204 Mich.App. 459, 464, 517 N.W.2d 235 (1994)…………………….………16

*Rosser v. Columbia Mut. Ins. Co.,*
    55 Ark. App. 77, 928 S.W.2d 813, 816 (1996) ..........................................16

*Simpson v. Wright Med. Grp.,*
    No. 5:17-CV-00062-KGB, 2018 WL 1570795, at *10 (E.D. Ark. Mar. 30, 2018) .........................................................................................................20

*Snow v. Grace*,
    25 Ark. 570 (1869)...................................................................................22

*Street v J.C. Bradford & Co.,*
    866 F. 2d 1472 (6th Cir. 1898) .................................................................11

*Titan Ins. Co. v. Hyten*,
    91 Mich. 547, 555, 817 N.W.2d 562 (2012)……………………………16, 18

*U. S. Fid. & Guar. Co. v. Black*,
    412 Mich. 99, 121, 313 N.W.2d 77, 86 (1981)……………………………20

## **Court Rules**

Fed. R. Civ. P. 56 ...........................................................................11,23

## **Other**

*Michigan Law & Practice, Damages*,
     s. 91, p. 88; 22 Am.Jur.2d, Damages, s 245, p. 337………………………..22

## ISSUES PRESENTED

1. Should Cameron Wire and Cable Inc.'s ("Cameron Wire") claim for breach of implied duty of good faith be dismissed as a matter of law?

   Cameron Wire's Answer: No
   Ventower's Answer: Yes
   The Court should answer: Yes

2. Should Cameron Wire and Cable Inc.'s claims for fraud against Great Lakes Towers, LLC, d/b/a Ventower Industries ("Ventower") and Gregory Adanin be dismissed as a matter of law?

   Cameron Wire's Answer: No
   Ventower and Mr. Adanin's Answer: Yes
   The Court should answer: Yes

3. Should Cameron Wire's request for exemplary damages be dismissed as a matter of law?

   Cameron Wire's Answer: No
   Ventower's Answer: Yes
   The Court should answer: Yes

## I.      STATEMENT OF MATERIAL FACTS

1.      This is a commercial dispute between a customer and a supplier.

2.      Plaintiff Great Lakes Towers, LLC d/b/a Ventower Industries ("Ventower") manufactures wind turbine towers.[1]

3.      Third Party Defendant Gregory Adanin ("Mr. Adanin" together with Ventower, the "Ventower Parties") is the CEO and President of Ventower.[2]

4.      Defendant Cameron Wire and Cable Inc. ("Cameron Wire") sells specialty wire and cable products.[3]

### Purchase Order 4461

5.      In August 2018 Ventower issued purchase order 4461 ("PO 4461") to Cameron Wire.[4] Under PO 4461, Ventower ordered 61 sets of cable from Cameron Wire to be used for the wind turbine towers Ventower was constructing for its customer, General Electric ("GE").

6.      Ventower's Terms and Conditions are incorporated by reference into PO 4461.[5] The Terms and Conditions contain the following relevant provisions:

> (1)    The terms of this Agreement may not be varied or modified in any manner, unless in a subsequent writing signed by an authorized representative of Buyer. Seller's written acknowledgement, commencement of work on the goods, or shipment of such goods,

---

[1] *Exhibit A*, Gregory Adanin Deposition, p. 90:12-15
[2] *Exhibit A*, Gregory Adanin Deposition, p. 11:23-25
[3] *Exhibit B,* Robert Cameron Deposition, p. 9:9-10
[4] *Exhibit C*
[5] *Exhibit D*

1

whichever occurs first, shall be deemed an effective mode of acceptance of the express terms set forth in this Agreement…Any proposal for additional terms or any attempt by Seller to vary in any degree any of the terms of this offer is hereby objected to and rejected... Additional or different terms or any attempt by Seller to vary in any degree any of the terms of this Agreement shall be deemed material and are objected to and rejected.

(2)    (a) [T]he goods shall strictly conform to all specifications, drawings, instructions, advertisements, statements on containers or labels, descriptions and samples; (b) the goods shall be free from defects in workmanship and material and shall be new and of the highest quality; … (d) goods shall be … fit for Buyer's intended purposes, which have been communicated to Seller….

If Buyer experiences any defect… at Buyer's option…(3) require Seller to repair or replace the defective foods in whole or in part at Seller's sole expense, including all shipping, transportation and installation costs.

(4)    Time is of the essence.

(5)    The following are causes, among others, allowing Buyer to terminate this order: (i) late delivery, (ii) delivery of goods that are defective or that do not conform to this Agreement.

(12)(D) GOVERNING LAW; DISPUTES. This Agreement shall be construed and interpreted in accordance with the laws of the State of Michigan.

7.    PO 4461 also incorporated by reference GE's specifications.[6]

8.    PO 4461 contained specific release dates for the 61 sets of cables. The order was divided into three (3) releases: (1) 20 sets – 9/17/18; (2) 20 sets – 11/13/18; and (3) 21 sets – 1/8/19.

---

[6] *Exhibit C*

2

9. Cameron Wire sent its Order Acknowledgement[7] on September 5, 2018 and asked Ventower to change the delivery terms from FOB Destination to FOB Origin/Collect.

10. Cameron Wire's Order Acknowledgement also attempted to change the release dates:

|  | Ventower  PO 4461 | Cameron Wire Order Acknowledgement |
|---|---|---|
| Release 1 | 20 sets – 9/17/18 | 12/07/18 |
| Release 2 | 20 sets – 11/13/18 | 12/07/18 |
| Release 3 | 21 sets – 1/8/19 | 01/0819 |

11. Ventower accepted the FOB Origin/Collect delivery term but did not accept the new release dates. On September 10, 2018, Ventower sent a revised PO 4461 ("Revised PO 4461") with the new FOB Origin/Collect term and the original release schedule.[8] Cameron Wire did not seek to change the release dates in Revised PO 4461.

12. Cameron Wire did not meet the release dates in Revised PO 4461. Cameron Wire sent the first partial shipment (containing only 8 of the 20 sets of cable) to Ventower on or around October 4, 2018.[9]

**Nonconforming Cables Supplied To Ventower**

13. In early December 2018, Ventower began installing the cables supplied

---

[7] *Exhibit C*
[8] *Exhibit E*
[9] *Exhibit F*

by Cameron Wire. During installation, Ventower discovered that the cables were nonconforming, as they failed to meet the GE specifications.[10]

14.    Those specifications are based, in pertinent part, on UL standards.[11] The UL standards require, among other things, specific criteria for cable markings. In particular, the markings must be printed in a certain manner, must be legible, and must be placed no more than 40" apart, along the length of the cable[12].

15.    The cables that Cameron Wire supplied did not meet these legibility and labeling requirements.[13]

16.    Ventower shipped the cables back to Cameron Wire and requested Cameron Wire perform a root cause analysis to determine and address the nonconformance.[14]

17.    In the meantime, Ventower had already begun installing the cable into wind turbine towers. Each tower consists of three or four sections. Each section is approximately 100 feet long and 15 feet in diameter and weighs a hundred thousand pounds or more. The nonconforming cable had been installed in multiple tower sections. Ventower had to move those tower sections from Ventower's

---

[10] ***Exhibit G***

[11] UL (Underwriter Laboratories, Inc.) is a global safety leader that creates regulatory standards for the manufacturing of certain products such as wire and cable.

[12] ***Exhibit H,*** Sylena McGowan Deposition, p. 31:24-32:14, 119:1-5

[13] ***Exhibit H,*** Sylena McGowan Deposition, p. 31:24-32:14

[14] ***Exhibit H,*** Sylena McGowan Deposition, p.101:24-102:4

manufacturing facility to a lay down area outside, where the tower sections had to be tarped and protected against the weather. In addition, because Ventower did not have enough conforming cable to install but could not afford to stop manufacturing altogether, it had to continue moving incomplete tower sections from Ventower's manufacturing facility to the lay down area outside until it received conforming cable from Cameron Wire. Once it received conforming cable, Ventower had to send crews outside to open the tarps, enter the tower sections, remove nonconforming cable, install conforming cable, and then re-tarp the tower sections. This all occurred during the winter months of December 2018 through April 2019 so the work was particularly hazardous and slow.[15]

18.    In February 2019, Ventower received another shipment of cable. Like the first shipment, this shipment also was nonconforming.[16] In fact, Cameron Wire had shipped the **_exact same cables_** that Ventower had rejected as nonconforming in December 2018.[17]

19.    In early 2019, Ventower was communicating regularly with Cameron Wire about the urgency and importance of meeting the release dates in Revised PO 4461.[18] Ventower specifically notified Cameron Wire that it would be liable for the

---

[15] **_Exhibit A,_** Gregory Adanin Deposition, p.176:10-180:11
[16] **_Exhibit I_**
[17] **_Exhibit J,_** Scott Moore Deposition, p.114:19-115:18
[18] **_Exhibit K_**

costs incurred due to Cameron Wire's delays and nonconforming cables.[19]

20.    As a result of the delays and the two nonconforming shipments, Ventower incurred $69,243.00 in costs, including 846 labor hours totaling $59,643.00 and $9,600.00 for lost production time. Ventower's project manager, Sylena McGowan, prepared a debit memo reflecting these costs.[20]  Ms. McGowan explained in her deposition how she calculated the amount reflected in the debit memo by contacting department heads to determine how many hours were incurred by each department.[21]

21.    In a show of good faith and to prevent further delayed shipments, in early 2019, Ventower paid Cameron Wire $102,001.46. [22] This amount was made via two separate payments:

| | |
|---|---|
| **January 16, 2019** | **$40,071.92**[23] |
| **February 19, 2019** | **$61,929.54**[24] |

22.    As provided in Revised PO 4461, the third and final release of 21 sets of cable was due to Ventower in January 2019.[25] Yet in April 2019, Cameron Wire still had not shipped the third release of cable.

---

[19] ***Exhibit K***
[20] ***Exhibit L***
[21] ***Exhibit H,*** Sylena McGowan Deposition, p. 204:22-205-5; 211:4-15
[22] ***Exhibit M***
[23] ***Exhibit M***
[24] ***Exhibit M***
[25] ***Exhibit E***

23.    Cameron Wire demanded that Ventower pay $83,874.69 *before* it would ship the third release. According to Cameron Wire, $52,286.31 of this demand was for outstanding invoices (for the earlier untimely and nonconforming releases), $77,213.38 was for *prepayment* of the third release—and which were already months late, $4,375 was for shipping costs, less $50,000 that was line itemed "Credit Limit". [26]

24.    Ventower refused this demand, as (1) prepayment was not a term of Revised PO 4461[27] and (2) Cameron Wire actually owed *Ventower* an amount due to the rework and lost production costs.[28]

25.    Cameron Wire did not ship the third release, and Ventower was forced to purchase 21 sets of cable from another supplier.

26.    On April 22, 2019, Cameron Wire sent its Ventower account to a collection agency, Altus Global Trade Solutions ("Altus").[29]

27.    In May 2019, Ventower sent Altus a copy of Ventower's debit memo showing the costs incurred by Ventower due to Cameron Wire's late and nonconforming shipments.[30]

---

[26] *Exhibit N*
[27] *Exhibit E*
[28] *Exhibit L*
[29] *Exhibit O*
[30] *Exhibit L*

28.     Cameron Wire immediately began investigating the debit memo.[31]

29.     According to Ryan King, Cameron Wire's controller, the purpose of the investigation was to "determine the validity of the debit memo."[32]

30.     This investigation was based on Cameron Wire's belief that "[i]t wouldn't take 846 hours to install three cables and pull them out."[33]

31.     Based on its "investigation", Cameron Wire concluded that Ventower "had not spent the amount of money or time that was being claimed installing and uninstalling cable."[34]

32.     Robert Cameron, Cameron Wire's Founder and Chief Executive Officer, testified that he personally thought the debit memo was fabricated as soon as he saw it. "I initially felt so when we first got it."[35]

## Compromise Agreement

33.     On September 10, 2019, Robert Cameron reached out to Mr. Adanin in an apparent effort to resolve the differences around Revised PO 4461.[36]

---

[31] Q: When did your investigation take place?
A: It started the day that we got the debit memo. *Exhibit P*, Ryan King Deposition, p. 24:10-11
[32] *Exhibit P*, Ryan King Deposition, p.26:20-22.
[33] *Exhibit P*, Ryan King Deposition, p.22:18-23
[34] *Exhibit P*, Ryan King Deposition, p.38:2-14.
[35] *Exhibit B,* Robert Cameron Deposition, p.60:5-6
[36] *Exhibit B,* Robert Cameron Deposition, p. 65:23-66:5

34.     Mr. Adanin traveled to Cameron Wire's headquarters in Little Rock, Arkansas to discuss possible resolutions.[37]

35.     On November 4, 2019, after Mr. Adanin returned to Michigan, he sent an email to Mr. Cameron containing the proposed terms of a compromise ("Compromise Agreement"). That email stated:

1.  Ventower will offset 50% of its debit memo amount of $69.243.00 against open invoices from Cameron Wire which currently have a balance of $59,488.84 resulting in the net payable of $24,864.34 to Cameron Wire. Venotwer will make payment on/before Nov 29th 2019.

2.  Ventower will purchase "21 sets" of cable remaining on the PO 4461 which were canceled due to non-delivery. The value of these cables is $77,212.38. Ventower will pay invoices for these cables on/before ship dates
    The cables will be shipped as follows:
    a.  10 Sets – Week of Jan 6th 2020
    b.  11 Sets – Week of Feb 3rd 2020

3.  Cameron Wire to insure FY 2020 cable shipments are in full compliance with Ventower requirement and will provide requested documentation/confirmation as may be requested by Ventower.

4.  Ventower will give Cameron Wire opportunity to bid on future projects and will include Cameron Wire in upcoming projects RFP(s).[38]

36.     On that same day, Mr. Cameron responded to Mr. Adanin's email with the following: "*Agreed and hopeful we can make this positive moving forward.*"[39] [italics added].

---

[37] ***Exhibit B***, Robert Cameron Deposition, p. 69:11-17
[38] ***Exhibit Q***
[39] ***Exhibit Q***

9

## Cameron Wire Repudiates the Compromise Agreement

37.     In accordance with the Compromise Agreement, on November 29, 2019, Ventower paid Cameron Wire $24,864.34, the amount of the agreed offset in the Compromise Agreement.[40]

38.     Ventower then paid Cameron Wire $36,685.00[41] in prepayment for the first shipment of 10 sets of cable under the Compromise Agreement. Cameron Wire shipped those cables to Ventower.[42]

39.     On February 5, 2020, Ventower paid Cameron Wire $40,353[43] in prepayment for the second shipment of 11 sets of cable under the Compromise Agreement.[44]

40.     After this prepayment, on February 10, 2020, Cameron Wire informed Ventower that it did not intend to ship the final 11 sets of cable because it disagreed with the charges in the debit memo.[45]

41.     Cameron Wire demanded Ventower pay an *additional* $27,577.30 before it would ship the final 11 sets of cable.[46] Ventower refused and chose to pursue its legal remedies.

---

[40] *Exhibit Q*
[41] *Exhibit M*
[42] *Exhibit F*
[43] *Exhibit M*
[44] *Exhibit F*
[45] *Exhibit R*
[46] *Exhibit R*

## II.   <u>STANDARD OF REVIEW</u>

A motion for summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) quoting Fed. R. Civ. P. 56(a). Whether a given fact is material must be determined by review of the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The motion should be granted where the non-movant has **<u>failed to provide proof on an essential element of its claim</u>**, thus rendering all other facts immaterial. *Celotex*, 477 U.S. at 322-323. [emphasis added].

A movant can meet its burden by showing the absence of a genuine issue as to any "essential element" of plaintiff's case. *Street v. J.C. Bradford & Co*, 886 F. 2d 1472, 1479 (6th Cir. 1989). In response, the respondent "cannot rely on the hope that the trier of fact will disbelieve" the movant, but rather must present "affirmative evidence" to defeat the motion. *Id.* 1479. The "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Id.* at 1476.

## III.   <u>ARGUMENT</u>

### A.   <u>Count II - Breach Of Contract - Fails As A Matter Of Law</u>

Count II of Cameron Wire's Counterclaim and Third-Party Complaint alleges Ventower breached its implied duty of good faith in the performance of its agreement with Cameron Wire. This is not a recognized cause of action in Michigan. As

11

explained by the Michigan Court of Appeals, "Michigan does not recognize a claim for breach of an implied covenant of good faith and fair dealing." *Belle Isle Grill Corp v. Detroit,* 256 Mich.App 463, 476; 666 NW2d 271 (2003) (claim for breach of implied covenant of good faith and fair dealing properly dismissed). Count II should be dismissed.

### B.   <u>Count III & IV For Fraud Fail As A Matter Of Law</u>

There is a choice of law question as to whether Michigan or Arkansas law applies to Cameron Wire's fraud claims. See *Moses v. Bus. Crd Express, Inc.*, 929 F.2d 1131, 1140 (6th Cir. 1991). However, this question is ultimately immaterial because regardless of which state's law applies, the outcome would be the same. Each section below cites to both Arkansas and Michigan case law.

Count III is a claim of fraud against Ventower and Count IV is a claim of fraud against both Ventower and Mr. Adanin. In Count III, Cameron Wire claims that Ventower made false representations in its debit memo. In Count IV, Cameron Wire claims Mr. Adanin, the CEO of Ventower, made false representations to Cameron Wire when he agreed to send future business to Cameron Wire as part of the Compromise Agreement discussed above. Both claims fail as a matter of law because Cameron Wire cannot support the essential elements of a fraud claim.

Under Michigan law, a party alleging fraud must prove the following elements:

(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage

*Bennett v. MIS Corp.*, 607 F.3d 1076, 1100-1101 (6th Cir. 2010).[47]

### i.   There Is No Evidence That The Debit Memo Was False

Cameron Wire alleges that Ventower made false representations in the debit memo. There is no evidence to support this assertion. Mr. Adanin detailed the additional work Ventower had to undertake as a result of Cameron Wire's delays and nonconformances. Ms. McGowan detailed the process she undertook to gather and record the part numbers, labor hours and lost production time in the debit memo. Both Ms. McGowan and Mr. Adanin confirmed that the information in the debit memo was correct.[48][49]

Mr. King claimed the debit memo was false because "it wouldn't take 846 hours to install three cables and pull them out."[50] Mr. King also admitted that he is

---

[47] (1) a misrepresentation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damages suffered as a result of the reliance. *Born v. Hosto & Buchan, PLLC*, 372 S.W.3d 324, 333 (Ark. 2010).

[48] *Exhibit H,* Sylena McGowan Deposition, p.204:22-205:5; 213:5-19

[49] *Exhibit A,* Gregory Adanin Deposition, p.180:12-181:1; 182:11-19, 183:2-6, 184:20-185:7

[50] *Exhibit P*, Ryan King Deposition, p. 22:22

not familiar with Ventower's manufacturing process or labor practices.[51]

Mr. Adanin and Ms. McGowan made clear that the process was much more involved than simply installing cables and then pulling them out. Each tower section is 100 feet long, fifteen feet in diameter and weighs over 100,000 pounds. Ventower had to move each tower section with nonconforming cable to a laydown area outside the manufacturing facility. Ventower also had to move each incomplete tower section to the laydown area until it received conforming cable. Ventower had to tarp each tower section to protect it from the winter weather. When it received conforming cable, Ventower had to remove the tarps from each tower section so it could access the section to install conforming cable and then re-tarp each section when it was done.

Ventower had to remove nonconforming cable from the impacted sections and reinstall conforming cable in each section. This all had to be completed on large tower sections that require coordination and significant effort to move around which amounts to hours of a labor in addition to hours sorting and quarantining nonconforming cable. Ventower incurred additional labor hours preparing quality assurance documentation. In short, there is ample support in the record for the numbers in Ventower's debit memo.

Cameron Wire did not retain any expert or other third-party to review or audit

---

[51] ***Exhibit P,*** Ryan King Deposition, 22:22-23:7

the debit memo. Instead, Mr. King explained in deposition that he believed the debit memo was fraudulent based on his personal belief that the numbers in it were too high. Mr. King testified that his investigation was not documented in any way: "It would have just been data in my head that obviously didn't add up …"[52] But even that empty assertion lacks support, as Mr. King testified that he kept no file or other documents regarding this issue, and instead explained that all the relevant information was in his head.[53] In short, Cameron Wire's lack of familiarity with Ventower's manufacturing process and its "disbelief" regarding the numbers in the debit memo do not support a claim of fraud. Ventower had a good faith, factual basis for the debit memo. *Hi-Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 247 N.W.2d 813 (1976) (each of the elements of fraud must be proved … and all of them must be found to exist; absence of any one of them is fatal to a recovery); *Beatty v. Haggard,* 87 Ark. App. 75, 84, 184 S.W.3d 479, 485 (2004) (representations are construed to be fraudulent when made by one who either knows the assurances are false or else not knowing the verity asserts them to be true.). Cameron Wire's fraud claim does not withstand scrutiny.

     ii.   **Cameron Wire Could Not Have Justifiably Relied On A Debit Memo That It Believed To Be False When Received**

---

[52] ***Exhibit P***, Ryan King Deposition, p.103:12-13
[53] ***Exhibit P***, Ryan King Deposition, p.75:2-7

Even if there was some factual basis for claiming that Ventower made false representations in the debit memo (there is not), there is no evidence that Cameron Wire justifiably relied on any such representation. Reliance is a necessary element of actionable fraud. *Titan Ins. Co. v. Hyten*, 491 Mich. 547, 555, 817 N.W.2d 562 (2012); *Hamade v Sunoco, Inc*, 271 Mich. App. at 171, 721 N.W.2d 233; *Kelley v. Mid Continent Leasing Co.*, 269 Ark. 912, 916, 601 S.W.2d 257, 259 (Ct. App. 1980). Here, Mr. Cameron testified that he felt the debit memo was fabricated when he "first got it." Mr. King testified that he began investigating the debit memo immediately after receiving it because he felt the numbers were too high. If Cameron Wire truly believed that the debit memo was fabricated when first received and immediately began investigating, then Cameron Wire could not have justifiably relied on the debit memo thereafter as a matter of law. *Nieves v. Bell Industries, Inc.*, 204 Mich.App. 459, 464, 517 N.W.2d 235 (1994). ("[A] plaintiff cannot claim to have been defrauded where he had information available to him that he chose to ignore."); *Rosser v. Columbia Mut. Ins. Co.*, 55 Ark. App. 77, 928 S.W.2d 813, 816 (1996) ("We hold that appellant's failure to produce facts showing that any reliance on her part was justifiable warranted the trial court's decision to grant summary judgment against her and in favor of the appellees.") Count III should be dismissed.

### iii.  <u>Fraud Cannot Be Based On A Future Promise</u>

16

Cameron Wire next claims Mr. Adanin made a false representation during the meeting in Little Rock when he told Mr. Cameron that Ventower would send future business opportunities to Cameron Wire. This was confirmed in the email Mr. Adanin sent following the meeting. ("Ventower will give Cameron Wire opportunity to bid on future projects and will include Cameron Wire in upcoming projects RFP(s)").

To begin, this statement was a future promise, not a statement relating to a past or existing fact, and future promises cannot form the basis of a fraud claim. *Hi-Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 336, 247 N.W.2d 813, 816 (1976) (future promises are contractual and do not constitute fraud); *Hobson v. Entergy Arkansas, Inc.*, 2014 Ark. App. 101, 10, 432 S.W.3d 117, 124 (2014) (it is well-established that representations that are promissory in nature, or of facts that will exist in the future, though false, will not support an action for fraud) (citations omitted).

Furthermore, there is no evidence that this future promise was false when made. Mr. Adanin testified that the only reason Ventower did not send Cameron Wire additional business opportunities between November 2019 (when he wrote the email) and February 2020 (when Cameron Wire repudiated the Compromise Agreement) is because there were **_no_** business opportunities to send to Cameron

17

Wire.[54] Without a false representation, Cameron Wire's fraud claim fails. *Beatty v. Haggard,* 87 Ark. App. 75, 84, 184 S.W.3d 479, 485 (2004) (Representations are construed to be fraudulent when made by one who either knows the assurances are false or else not knowing the verity asserts them to be true); *Hi-Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 247 N.W.2d 813 (1976) (each of the elements of fraud must be proved with a reasonable degree of certainty, and all of them must be found to exist; absence of any one of them is fatal to a recovery).

### iv.   There Is No Evidence That Cameron Wire Justifiably Relied On A Future Promise

Reliance is a necessary element of actionable fraud. *Titan Ins. Co. v. Hyten*, 491 Mich. 547, 555, 817 N.W.2d 562 (2012); *Hamade v Sunoco, Inc*, 271 Mich. App. at 171, 721 N.W.2d 233; *Kelley v. Mid Continent Leasing Co.,* 269 Ark. 912, 916, 601 S.W.2d 257, 259 (Ct. App. 1980) *(*Reliance is a primary element in the action for deceit). In its Counterclaim and Third-Party Complaint, Cameron Wire provided six examples of its alleged reliance on Ventower's future promise. Cameron Wire claims that it (1) delayed its collection efforts; (2) refrained from filing a lawsuit against Ventower; (3) refrained from selling 11 sets of cables that were ready for shipment to Ventower to other customers; (4) incurred administrative and labor costs; (5) agreed to apply a discount to the amounts Ventower allegedly

---

[54] *Exhibit A*, Gregory Adanin Deposition, p. 197:2-5

owed to Cameron Wire; and (6) shipped ten sets of cable to Ventower in January 2020. None of these claims withstand scrutiny. Each will be discussed in turn.

Cameron Wire claims it delayed its collection efforts and refrained from filing suit against Ventower in reliance on Ventower's promise of future business opportunities. This is demonstrably false. Cameron Wire instituted collection efforts against Ventower in April 2019 before the alleged promise was made. Indeed, the only reason Altus was even involved in April 2019 is because Cameron Wire had referred its Ventower account to Altus as its collection agency. Moreover, it is undisputed Cameron Wire actually *has* pursued collection efforts and has filed suit against Ventower. Nothing was lost by any alleged delay.

Cameron Wire claims that it would have sold the cable to other customers, but did not, in reliance on Ventower's future promise. But Mr. Cameron admitted in deposition that Cameron Wire **could not** sell the sets of cables to other customers due to the custom cutting required by Ventower.[55]

Reliance implies a choice—a party that is defrauded relies on a representation by choosing to act one way, as opposed to another way. *U. S. Fid. & Guar. Co. v. Black*, 412 Mich. 99, 121, 313 N.W.2d 77, 86 (1981) ("It is well settled in Michigan that the test for determining the existence of reliance is [ ] whether the misrepresentation exerted a material influence" on the actions of the plaintiff) citing

---

[55] ***Exhibit B***, Robert Cameron Deposition, p.27:16-28:3

*Callihan v. Talkowski*, 372 Mich. 1, 6, 124 N.W.2d 788 (1963); *Gage Prod. Co. v. Henkel Corp.*, 393 F.3d 629, 646 (6th Cir. 2004) (Reiterating same test for reliance in Michigan); *Clements Auto Co. v. Serv. Bureau Corp.*, 444 F.2d 169, 185 (8th Cir. 1971) (party's reliance manifested as having "the choice of terminating the contracts [ ] or of assuming responsibility for further damages.") *See also, Simpson v. Wright Med. Grp.,* Inc., No. 5:17-CV-00062-KGB, 2018 WL 1570795, at *10 (E.D. Ark. Mar. 30, 2018) (Plaintiff properly pled reliance element of fraud where he alleged that "he **chose** [the recommended] hip device, [and thereby] relied on the representations of his physician"). There can be no choice, and therefore no reliance, if Cameron Wire admits there was no market for these cables.

Cameron Wire claims it incurred administrative costs in reliance on Ventower's future promise. Again, this is not an example of reliance. It is the opposite of reliance. Cameron Wire incurred administrative costs investigating the debit memo because it believed the debit memo to be inaccurate, not because it believed the debit memo to be accurate.

Cameron Wire suffered no detriment when it applied a discount to Ventower's balance owed in reliance on the promise of future business and when it shipped the January 2020 cables. First, Cameron Wire can't argue they relied on future business opportunities when they repudiated on the Compromise Agreement shortly after entering it. Cameron Wire effectively closed the door to future business

opportunities from Ventower by repudiating. Any detriment Cameron Wire suffered was due to their repudiation and not Ventower's failure to provide business opportunities. Second, there was no detriment incurred to Cameron Wire by shipping the first release in the Compromise Agreement (ten sets of cables) to Ventower. Cameron Wire shipped those ten sets of cable on January 14 because ***Ventower prepaid for those 10 sets,*** per the Compromised Agreement. There can be no detriment as Cameron Wire was ***paid in full*** for the 10 sets of cables. *Hi-Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 247 N.W.2d 813 (1976) (each of the elements of fraud must be proved with a reasonable degree of certainty, and all of them must be found to exist; absence of any one of them is fatal to a recovery). *Beatty v. Haggard*, 87 Ark. App. 75, 84, 184 S.W.3d 479, 485 (2004) (To establish fraud, the following ***elements must be proven***: (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; (5) ***damage suffered as a result of the reliance***.) (emphasis added).

### C.     Exemplary Damages Fail As A Matter Of Law

Exemplary damages are a class of damages that allow for compensation for injury to feelings. "The act or conduct must also be malicious or so willful and wanton as to demonstrate a reckless disregard of [a] plaintiff's rights." *McPeak v.*

*McPeak,* 233 Mich.App. 483, 593 N.W.2d 180, 183 (Mich.Ct.App.1999) (citation omitted). It follows that in cases involving a breach of contract, the general rule is that exemplary damages are not recoverable. *Michigan Law & Practice, Damages*, s 91, p. 88; 22 Am.Jur.2d, Damages, s 245, p. 337. This is because the plaintiff's damages can be adequately compensated when damages are awarded under the terms of the contract. *Kewin v. Massachusetts Mut. Life Ins. Co.,* 409 Mich. 401, 419–21, 295 N.W.2d 50, 55 (1980) (Exemplary damages may not be awarded in common-law actions brought for breach of a commercial contract); *Snow v. Grace*, 25 Ark. 570 (1869) "Punitive damages are not ordinarily recoverable for breach of contract."); *McClellan v. Brown*, 276 Ark. 28, 30, 632 S.W.2d 406, 407 (1982) ("To support a claim for punitive damages there would have to be a willful or malicious act in connection with a contract. A bare allegation of fraud which results in a monetary loss would not justify punitive damages.") Here the basis for the claims is a commercial contract. The tort claims here are merely a repackaging of the contract claims. The fraud claims are not supported by competent evidence, much less provide a basis for exemplary damages.

Moreover, there is no evidence that any conduct has risen to the high standard of being so malicious or so willful and wanton as to demonstrate a reckless disregard of a plaintiff's rights. *Casey v. Auto Owners Ins. Co.,* 273 Mich.App. 388, 729 N.W.2d 277, 286 (Mich.Ct.App.2006). There is at best a mere allegation of fraud

resulting in monetary loss, which, as explained above, is not supported by competent evidence. There is no basis for exemplary damages.

## V. <u>CONCLUSION</u>

For all of the foregoing reasons, the Ventower Parties respectfully requests that the Court dismiss counts II-IV and the request for exemplary damages in Cameron Wire's Counterclaim and Third Party Complaint pursuant to Fed. R. Civ. P. 56.

Date: December 20, 2021

                Respectfully submitted,

                Hickey Hauck Bishoff Jeffers & Seabolt, PLLC

                By:<u>/s/ Scott T. Seabolt____</u>
                Scott T. Seabolt (P55890)
                Brooke Booth (P67731)
                706 South Main Street
                Plymouth, Michigan 48170
                (313) 964-8600
                sseabolt@hhbjs.com